# UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ANDRES CONTRERAS, | 1:09-cv-00994-OWW-DLB (HC) |
| Petitioner, | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | |
| F.B. HAWS, Warden | [Doc.1] |
| Respondent. | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

## BACKGROUND

Following a jury trial in the California Superior Court, County of Tulare, Petitioner was convicted of first degree murder (Cal. Penal Code[1] § 187, subd. (a); Count 1), attempted premeditated and deliberate murder (§§ 187, subd. (a), 664; Counts 2 and 4); permitting a person to discharge a firearm from a motor vehicle (§ 12034, subd. (b); Count 3), discharging a firearm from a motor vehicle (§ 12034, subd. (c); Count 5); and shooting at an inhabited dwelling (§ 246; Count 6). The jury also found true the following enhancements: as to Count 1, that the murder was committed while Petitioner was an active participant in a criminal street gang (§ 190.2, subd. (a)(21); that the crimes were committed "for the benefit of, at the direction of, or in association with a criminal street gang" (§ 186.22, subd. (b)(1)(A); as to Counts 1 and 2, that a principal

---

[1] All further statutory references are to the California Penal Code unless otherwise indicated.

1

discharged a firearm and caused great bodily injury or death (§ 12022.53, subds. (b), (c), (d), (e)(1) in the commission of the charged crimes); and as to Counts 4, 5, and 6, that Petitioner personally used a firearm in the commission of the charged offenses (§ 12022.5, subd. (a)). (I CT 147-148, 216-221.) Petitioner was sentenced to an aggregate term of life imprisonment without the possibility of parole plus 25 years to life. (Id. at 237-242.)

Petitioner filed a timely appeal to the California Court of Appeal, Fifth Appellate District. On December 27, 2007, the Court of Appeal reversed Petitioner's sentence and remanded the case for re-sentencing, but affirmed the judgment in all other respects. (Lodged Doc. No. 1.)

The California Supreme Court denied Petitioner's petition for review on April 9, 2008. (Lodged Doc. Nos. 2 & 3.)

Petitioner filed the instant federal petition for writ of habeas corpus on June 8, 2009. (Doc. 1.) On August 10, 2009, Petitioner filed an amendment to the petition naming the proper respondent. (Doc. 7.)

On October 16, 2009, Respondent filed an answer to petition. Petitioner did not file a traverse.

## STATEMENT OF FACTS[2]

On March 26, 2005, Alejandro Gonzales reported that his white Honda four-door car had been stolen.

Pedro Flores was standing outside of his home on Easter morning March 27, 2005. A white car with two Hispanic male occupants drove by. The occupants of the car stared at Flores. Flores "flipped them off" and made a Northerner gang sign. The car turned around and one of the occupants fired shots at Flores. Flores later told an officer that the driver was the shooter. Flores ran inside and moved his sister from the front bedroom to the rear bedroom. More shots were fired into the front bedroom. Flores testified that the passenger was the person who was shooting after Flores went inside the house. Flores described the driver as skinny and the passenger as heavier. A handgun was used.

J.B., an 11-year-old neighbor of Flores, testified he was playing in the backyard on Easter morning. He heard gunshots and ran to a window and looked out. Flores was calling out names to the males in a four-door white car. The car contained two males in the front seat. Flores went inside his home. The car

---

[2] The following summary of facts are taken from the opinion of the California Court of Appeal, Fifth Appellate District, Lodged Document Number 1, of the Answer to the Petition for Writ of Habeas Corpus. The Court finds the state Court of Appeal's summary is a correct and fair summary of the facts of the case.

2

turned around and the passenger started shooting a rifle.

Later that same Easter morning, V was with his older brother, Anthony Castro (Castro). They went to a gas station to put gas in his mother's car. A white Honda drove by and the passenger flashed a Southerner gang sign at them. V and Castro ignored the incident. The driver stopped at the gas station and put gas in the car. V said the driver was skinny. They left the gas station and the white Honda followed them.

Castro then drove to pick up his good friend Alejandro Salazar, a Norteno gang member. Castro was still being followed by a white Honda with two males inside. The Honda continued to follow them after Castro picked up Salazar. Castro returned to his house and dropped off V. Castro changed his clothes and then he and Salazar began walking back to Salazar's house.

As Castro and Salazar were walking back toward Salazar's house, the white Honda drove in their direction. A rifle came out of the back seat window and shots were fired. Salazar fell to the ground, then got up and ran to his house. Castro ran into a different house.

V was outside of his house when his cousin Sandra came and said that Castro had been shot. V saw the white Honda speeding away from the area. Castro had been shot three times. He bled to death from the gunshot wound to his back. This bullet passed through his lever, kidney, diaphragm and heart. He had two other bullet wounds, one to his leg and one to his hip.

Salazar's aunt took Salazar to the hospital. He had been shot three times, once each to the head, back and leg.

On Easter morning, law enforcement received a call reporting the location of a stolen vehicle. Deputy Sheriff William Hakker went to the location. He saw a white Honda with a Hispanic male in the driver's seat. The male ran into an apartment. [Petitioner] came out of the same apartment; he was not the male who ran inside the apartment. The white Honda matched the description of a vehicle used earlier in a shooting. The vehicle contained a .22 rifle, and a 12-gauge shotgun.

[Petitioner] was questioned. At first, [Petitioner] denied all involvement in the shootings. He then admitted that during the first shooting he shot at the window of the house. In the second shooting, [Petitioner] was driving when Ezekial Perez shot at the two males walking down the street. [Petitioner] said that earlier that morning he went to Kmart with Exekial and gave him money to buy ammunition. Ezekial bought the ammunition.

On Easter morning, March 27, 2005, two bald, "gangster-type" males came into the Delano Kmart and purchased a box of .22 caliber ammunition. An employee of the store identified Ezekial Perez from a picture as the "chubby" person who walked out of the store with a bag of ammunition.

Stephen Pederson testified as an expert on gangs. He testified that [Petitioner] was a gang member and the crimes were committed for the benefit of a criminal street gang.

(Lodged Doc. No. 1, Opinion, at 2-4.)

# DISCUSSION

A.  Jurisdiction

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375, 120 S.Ct. 1495, 1504, n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. The challenged conviction arises out of the Tulare County Superior Court, which is located within the jurisdiction of this Court. 28 U.S.C. § 2254(a); 2241(d).

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059, 2063 (1997; Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *cert. denied,* 522 U.S. 1008, 118 S.Ct. 586 (1997) (quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107, 117 S.Ct. 1114 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320, 117 S.Ct. 2059 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and is therefore governed by its provisions.

B.  Standard of Review

Where a petitioner files his federal habeas petition after the effective date of the Anti-Terrorism and Effective Death Penalty Act ("AEDPA"), he can prevail only if he can show that the state court's adjudication of his claim:

> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. § 2254(d). A state court decision is "contrary to" federal law if it "applies a rule that contradicts governing law set forth in [Supreme Court] cases" or "confronts a set of facts that are materially indistinguishable from" a Supreme Court case, yet reaches a different result." Brown v.

4

Payton, 544 U.S. 133, 141 (2005) citing Williams (Terry) v. Taylor, 529 U.S. 362, 405-06 (2000). A state court decision will involve an "unreasonable application of" federal law only if it is "objectively unreasonable." Id., quoting Williams, 529 U.S. at 409-10; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002) (*per curiam*). "A federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly." Lockyer, at 1175 (citations omitted). "Rather, that application must be objectively unreasonable." Id. (citations omitted).

"Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. 322, 340 (2003). Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-77 (2004).

Courts further review the last reasoned state court opinion. See Ylst v. Nunnemaker, 501 U.S. 979, 803 (1991). However, where the state court decided an issue on the merits but provided no reasoned decision, courts conduct "an independent review of the record . . . to determine whether the state court [was objectively unreasonable] in its application of controlling federal law." Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2000). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).

C.  Ineffective Assistance of Counsel Claims

Petitioner alleges that trial counsel rendered ineffective assistance for (1) not being prepared for trial; (2) incorrectly referring to petitioner as a 15-year-old during opening statement and closing argument; (3) failing to object to hearsay statements made by various witnesses; and (4) asking Salazar to identify Petitioner in court as one of the perpetrators of the shooting in Richgrove. The Court will address each claim independently.

The law governing ineffective assistance of counsel claims is clearly established for the

purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064 (1984); Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir.1994).

Second, the petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Strickland, 466 U.S. at 688. The court must also evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994). More precisely, petitioner must show that (1) his attorney's performance was unreasonable under prevailing professional norms, and, unless prejudice is presumed, that (2) there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

A court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the petitioner as a result of the alleged deficiencies. Strickland, 466 U.S. 668, 697, 104 S.Ct. 2052, 2074 (1984). Since it is necessary to prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

Ineffective assistance of counsel claims are analyzed under the "unreasonable application" prong of Williams v. Taylor, 529 U.S. 362 (2000). Weighall v. Middle, 215 F.3d 1058, 1062

(2000). Because the instant petition was filed under § 2254, Petitioner must address "the doubly deferential judicial review that applies to a Strickland claim evaluated under the § 2254(d)(1) standard." Knowles v. Mirzayance, __ U.S. __, 129 S.Ct. 1411, 1420 (2009).

1. Inadequate Preparation for Trial

Petitioner contends that trial counsel was not prepared for trial because he incorrectly stated in his opening statement that the evidence would show that Petitioner did not commit, *inter alia*, an "assault with a deadly weapon" – a crime not charged in the accusatory pleading. (Petition, at 5.) In concluding his opening statement, defense counsel stated, "In the end, I believe that the evidence will show that [Petitioner] was not guilty of murder or assault with a deadly weapon." (RT 14.)

The California Court of Appeal rejected Petitioner's claim stating:

> [Petitioner]'s first claim of ineffective assistance of counsel is that defense counsel was not prepared for trial. [Petitioner] argues that defense counsel represented him at trial without filing any written motions, calling any witnesses, or filing a sentencing report. [Petitioner] fails to argue or show how any of these claimed deficiencies may have prejudiced him at trial.
>
> In addition to the above vague claims of lack of preparedness, [Petitioner] points to one specific instance as evidence that his counsel was unprepared. During his opening statement to the jury, defense counsel stated that the evidence will show that [Petitioner] is not guilty of murder or assault with a deadly weapon. [Petitioner] was not charged with assault with a deadly weapon. Although this was a misstatement by defense counsel, counsel may have used it merely as a short-hand term for the other counts, which all involved shooting a gun. In any event, [Petitioner] has failed to show any prejudice. The jury was well aware of the charges against [Petitioner] from the instructions and verdict forms. In addition, before the opening statement was made the court informed the jury that an opening statement is not evidence but is merely an overview as to what the attorney believes the evidence is going to be. [Petitioner] has failed to show that the alleged lack of preparation by his counsel had any effect on the outcome of his case.

(Lodged Doc. No. 1, Opinion, at 5.)

Viewed in the context of the entire proceedings, counsel's misstatement could not have prejudiced the outcome of the trial, and the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent. Immediately proceeding the opening statements, the trial court instructed the jury that it could not consider any statement made during opening presentation to be evidence in the case. (RT 11.) In

7

addition, the prosecutor explained during opening statement that the charges and law would be explained to the jury at the end of the presentation of the evidence. (RT 13.) The trial court later correctly instructed the jury on the charges and applicable law. (see e.g. RT 340-361.) Furthermore, counsel's misstatement was not an grossly inconsistent with the actual charges because all involved shooting a gun. Given these circumstances, it cannot be said that the appellate court's finding that there is a reasonable probability that, but for counsel's unprofessional errors, the result would have been different.

### 2. Incorrect Statements Regarding Petitioner's Age

Petitioner contends counsel was ineffective because he incorrectly referenced that Petitioner was 15 years-old during his opening and closing argument. (Petition, at 5.) Petitioner reasons that if counsel believed that Petitioner was only 15-years-old at the time of the shooting "he had a professional obligation to produce legally admissible evidence at trial to prove that contention." (Petitioner's Opening Brief at 17.) Petitioner argues that since a 15-year-old cannot be sentenced to serve a term of life in prison without the possibility of parole, the failure to counsel to establish his ineligibility was manifestly prejudicial. (Id.)

Although counsel incorrectly stated that Petitioner was 15 years-old at the time of the shooting, it is clear from the record that there was no evidence counsel could have presented to establish this fact. The probation report reflects that Petitioner was born on February 7, 1989, and Petitioner presents no evidence to the contrary, and because the crime occurred on March 27, 2005, he was clearly 16 years old at the time of the charged offenses. Accordingly, counsel's misstatement could not have prejudiced Petitioner as there was no basis to contest this factual matter. In fact, the Court of Appeal correctly noted, "it was to [Petitioner]'s benefit to be portrayed by defense counsel as young as possible." (Lodged Doc. No. 1, Opinion, at 6.) In light of such circumstances, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

### 3. Failure to Object to Hearsay Statements Made by Various Witnesses

Petitioner contends that counsel was ineffective for failing to object to various alleged inadmissible hearsay statements by several witnesses. (Petition, at 5.) As he did on direct appeal,

Petitioner argues defense counsel failed to object to various hearsay statements made by Pedro, Deputy Stamper, Victor Castro, and Deputy Hakker. The Court will address each sub-claim separately.

### a. Pedro's Testimony Regarding Weapon Used in First Shooting Incident

During direct examination of Pedro, the prosecutor asked if he had seen what the driver of the white Honda was using to shoot at him. (RT 60-61.) Pedro responded, "I thought it was .22, a smaller one. I thought it was a small. 22, but my neighbor said it was a rifle." (Id. at 61.)

Even if counsel should have objected to Pedro's hearsay statement, there was clearly no prejudice as a result. First, during his interview with Detective Benitez, Petitioner admitted that he had shot at Pedro using a .22-caliber rifle. Second, Pedro's neighbor, B.D., testified that the gun he saw was a rifle. Thus, Flores' testimony could not have altered the result of the proceeding, and the claim fails under Strickland.

### b. Pedro's Statements to Deputy Stamper

Tulare County Deputy Sheriff Julie Stamper testified that she responded to a call of a shooting at 1000 North Earlimart Street the morning of March 27, 2005. (RT 120-121.) Pedro told Deputy Stamper that it was "two Hispanic males in a white Honda or a possible white Acura that drove southbound on Earlimart Street, that shot at him while he was outside of the complex." (RT 121.) He also stated that the driver of the white car shot at him just before he entered his apartment. (RT 122.)

In denying this claim, the Court of Appeal, held:

> Flores testified that the white Honda drove by and "they started shooting at me." When asked who started shooting, Flores responded that he did not remember. Flores then reviewed his statement to law enforcement and agreed that the statement helped him recall who was shooting first. Later on, he testified that he thought it was the driver's side where the shooting came from. Flores was asked if he saw anything after he looked outside the window from inside his home. He testified he did not see anything else. He was asked to look at the report of Deputy Strange. Flores said that the report refreshed his memory. He was asked if he saw the passenger of the car shooting. He replied that he had not seen them that well. Flores testified he did not call the police right away because it did not matter to him, he did not like contact with the police, and he did not like the police "that much."
>
> On cross-examination, Flores was asked who was shooting after Flores had gone inside his home. He testified he saw the passenger shooting, then said it was

9

>       not the passenger, it was the other one, then he said he did not know and could not remember if that was when he saw the passenger shooting. He testified that he could not remember if the passenger had a gun in his hand when he looked out the window.
>
>       On redirect examination, Flores said he may have told the officer that he saw the passenger shooting at the apartment when he looked out the window, but he did not now recall.
>
>       Deputy [Stamper] testified that Flores told her that two Hispanic males were in the car from which shots were fired at him while he was outside his home. Flores told Deputy [Stamper] that when the car first drove by, the driver shot at him; when he was inside of the house he saw the passenger shooting at him. Flores told Deputy [Stamper] that he saw the passenger shooting at him with a possible .22 caliber handgun.
>
>       [Petitioner] argues that the testimony of Deputy [Stamper] was not admissible as a prior inconsistent statement because her testimony was consistent with Flores's testimony and any failure of Flores to recall was a case of innocent loss of memory.
>
>       "A witness's prior statement that is inconsistent with his or her testimony is admissible so long as the witness is given the opportunity to explain or deny the statement." (*People v. Ledesma* (2006) 39 Cal.4th 641, 710.) "[T]o the extent a claimed lack of memory amounts to deliberate evasion inconsistency is implied." (*People v. Gonzalez* (2006) 38 Cal.4th 932, 950.)
>
>       Flores made inconsistent statements within his own testimony and gave testimony that was inconsistent with his prior statements. In addition, the court could have found that his failure to remember was a deliberate evasion. Under either scenario, the testimony of Deputy [Stamper] was properly admitted as a prior inconsistent statement and counsel was not ineffective in failing to object to her testimony.

(Lodged Doc. No. 1, Opinion, at 7-8.)

Even if it is assumed that counsel's failure to object and/or move to strike the hearsay statements by Deputy Stamper, there is clearly no showing of prejudice because Petitioner admitted to Detective Benitez that he shot at Pedro while driving the white Honda. (CT 307.) Therefore, there is not a reasonable possibility that the result would been more favorable had counsel objected, and the claim fails under Strickland.

        c.     Victor Castro's Hearsay Testimony

As with the previous sub-claim, Petitioner contends defense counsel was ineffective for failing to object and/or move to strike Victor Castro's hearsay statements. During questioning by the prosecutor as to what happened after Alejandro Salazar and Anthony Castro left together on the morning of March 27, 2005, Victor responded, "My mom told me to close the gate. When I

went outside, my cousin came quick and told me my brother had been shot." (RT 174.) On direct appeal, Petitioner argued that because no foundation had been laid for the admission of Victor's testimony that he had been told by a cousin that Anthony had been shot, "defense counsel should have moved to strike that testimony."

In denying the claim, the appellate court stated:

> That [Victor's] cousin came and told him his brother had been shot had absolutely no evidentiary value in proving that [Petitioner] was guilty. This was commentary that Castro had been shot, a fact well-demonstrated by the autopsy. Defense counsel had no reason to object to an answer that provided nothing of evidentiary value. Also, because it provided no evidentiary value, any failure to object did not result in prejudice to [Petitioner].

(Lodged Doc. No. 1, Opinion, at 7-8.)

The fact that defense counsel failed to object to irrelevant hearsay evidence did not and could not have prejudiced the outcome of the trial. The testimony by Victor that his brother told him his cousin had been shot was irrelevant to the determination of Petitioner's guilt. Accordingly, the out-of-court statement had no evidentiary value to the details of the crimes. Petitioner had failed to demonstrate a reasonable probability that the result would have been different had defense counsel objected to the hearsay statement, and the claim fails under Strickland.

### d. Deputy Hakker's Testimony Regarding Deputy Kent's Question Relating to the Arsenal in the Back of the Stolen Honda

Deputy Hakker testified that "After we had all the subjects detained, Deputy Kent came up to me and asked if I had seen the, and he used the word 'arsenal,' in the back of the vehicle." (RT 197.) Hakker searched the interior of the Honda and found a .22-caliber rifle and a 12-gauge shotgun lying on the floorboard near the back seat. The stocks of both weapons appeared to be cut off. (Id.)

The California Court of Appeal denied the claim stating:

> The argument itself reveals the answer to the question. Two weapons do not constitute an "arsenal." The jury was clearly aware of this because Hakker testified that he found two weapons in the back of the Honda, and the pictures also showed this. The "arsenal" comment only shows that Deputy Kent was exaggerating, a fact clearly shown to the jury by the evidence. No prejudice could have resulted from this comment.

(Lodged Doc. 1, Opinion, at 10.)

During his testimony, Deputy Hakker stated "After we had all the subjects detained, Deputy Kent came up to me and asked if I had seen the, and he used the word 'arsenal,' in the back of the vehicle. That's when I looked inside the car and saw what was inside [it]." (RT 197.) Deputy Hakker further indicated that when he searched the vehicle he only found a .22 rifle and a 12-gauge shotgun. (Id.) Even if it assumed that counsel rendered deficient performance by failing to object to the use of the word "arsenal" the testimony was clear that only two weapons were found in the vehicle. It is reasonable to assume that the jury would not have been so inflamed against Petitioner for having possessed an "arsenal" of only two weapons. Accordingly, the state courts' determination of this issue was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

        e.    <u>Cross-Examination of Alejandro Salazar Regarding In-Court Identification of Petitioner as One of the Perpetrators of the Richgrove Shooting</u>

Petitioner claims counsel was ineffective because his cross-examination of Salazar elicited more damaging testimony than had been given on direct examination.

In rejecting the claim, the California Court of Appeal held:

> Salazar testified that he saw only the driver, but did not get a very good look at him. He said the driver was bald but could not remember his body type. On cross-examination, Salazar said he did not remember what the shooter looked like. Defense counsel asked if he recognized the [Petitioner] as being there during the shooting. Salazar responded, "A little bit." He was asked if [Petitioner] was the driver or the passenger and he said [Petitioner] was the passenger. Salazar thought [Petitioner] was the person who shot the gun. Salazar also said the driver was chunkier and the passenger was skinner. He was asked if he picked [Petitioner] out of a lineup. He said he did not pick out anybody from a lineup even though the lineup was right after the shooting. When asked how sure he was that [Petitioner] was the person who shot him, he replied, "Not that sure, because I really didn't see his face. I just seen that they were bald and that was it." When asked to give a percentage of certainty, he said he was about 60 percent sure [Petitioner] was the person who shot him.
>
> During closing argument, defense counsel argued that Salazar was not able to identify anyone from a photographic lineup including [Petitioner] right after the shooting. "Then mysteriously one year and six months later Salazar is sitting in the witness stand, and he identifies the [Petitioner] as being the shooter. But he doesn't say, 'Well, I"m one hundred percent sure he's the shooter.' He's 60 percent sure. Proof beyond a reasonable doubt. Is that 60 percent? It's got to be higher than that."

> [Petitioner] claims, . . ., that defense counsel made a fatal mistake when he opened the door during cross-examination to Salazar's identifying [Petitioner] as the shooter. [Petitioner] argues there could be no informed, tactical reason for defense counsel to help the prosecutor prove his client guilty of murder.
>
> Defense counsel was attempting to show Salazar's inability to identify the shooter when he questioned Salazar about the identify of the shooter. Although he may not have received the answer he was seeking, counsel cannot be faulted for seeking to show that Salazar could not identify [Petitioner] as the shooter. Defense counsel utilized Salazar's weak and questionable identification in his closing argument. Furthermore, [Petitioner] admitted he was in the car when shots were fired at Salazar and Castro. Counsel's decision to question Salazar on his identification was a sound tactical decision, and in any event it was not prejudicial since Salazar's identification was weak and [Petitioner] admitted he was in the car at the time of the shooting.

(Lodged Doc. No. 1, Opinion, at 8-9.)

The record established that Salazar could not positively identify Petitioner. On cross-examination, defense counsel sought to emphasize the fact that Salazar had not positively identified Petitioner. Although Salazar was able to identify Petitioner with sixty percent certainty, he also acknowledged that he did not identify Petitioner out of a photographic line just shortly after the shooting. (RT 158, 160.) Counsel used the weakness in Salazar's identification of Petitioner to benefit the defense in closing argument. Petitioner's counsel tactically argued:

> Salazar wasn't able to identify anybody. He wasn't asked to identify anybody. [¶] Then mysteriously one year and six months later Salazar is sitting in the witness stand, and he identifies [Petitioner] as being the shooter. Being the shooter on that date. But he doesn't say, 'Well, I'm one hundred percent sure he's the shooter.' He's 60 percent sure. Proof beyond a reasonable doubt. Is that 60 percent? It's got to be higher than that.

(RT 384.) Thus, given these circumstances, the fact that defense counsel sought to challenge the weakness in Salazar's testimony was not unreasonable or prejudicial. Accordingly, habeas corpus relief is not available on this claim. Strickland, 466 U.S. at 688; 28 U.S.C. § 2254(d)(1).

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and

2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the assigned United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of

1 the Local Rules of Practice for the United States District Court, Eastern District of California.
2 Within thirty (30) days after being served with a copy, any party may file written objections with
3 the court and serve a copy on all parties. Such a document should be captioned "Objections to
4 Magistrate Judge's Findings and Recommendation." Replies to the objections shall be served and
5 filed within ten (10) court days (plus three days if served by mail) after service of the objections.
6 The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).
7 The parties are advised that failure to file objections within the specified time may waive the right
8 to appeal the District Court's order. Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

**Dated: December 2, 2009**        /s/ **Dennis L. Beck**
UNITED STATES MAGISTRATE JUDGE